# IN THE SUPREME COURT OF IOWA

No. 17–0638

Filed May 18, 2018

**MATTHEW JAHNKE,**

Appellee,

vs.

**DEERE & COMPANY, RICHARD CZARNECKI,** and **BERNHARD HAAS,**

Appellants.

---

Appeal from the Iowa District Court for Polk County, David M. Porter, Judge.

The defendants were granted an interlocutory appeal from the denial by the district court of their motion for summary judgment. **REVERSED AND REMANDED.**

Frank Harty and Debra Hulett of Nyemaster Goode, P.C., Des Moines, for appellants.

Paige Fiedler and Nathan Borland (until withdrawal) of Fiedler & Timmer, P.L.L.C., Johnston, and Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for appellee.

**ZAGER, Justice.**

Matthew Jahnke was employed by Deere & Company and worked as the factory manager at Harbin Works located in Harbin, China, under a contract with the Deere Chinese subsidiary. Jahnke reported to Richard Czarnecki, who in turn reported to Dr. Bernard Haas.[1] In June 2014, Deere removed Jahnke as the factory manager of Harbin Works and repatriated him back to the United States. Deere ultimately assigned Jahnke to a position of lesser authority and lower pay in Waterloo, Iowa. This repatriation was taken as discipline for Jahnke engaging in unreported sexual relationships with two female, Chinese employees who were within his business span of control. Consequently, Jahnke filed suit under the Iowa Civil Rights Act alleging Deere discriminated against him based on his age, sex, and national origin. Deere moved for summary judgment claiming that the Iowa Civil Rights Act did not apply extraterritorially and that Jahnke based his claims on allegations of discriminatory acts that occurred outside of Iowa. The district court denied the motion. For the reasons expressed below, we reverse the decision of the district court.

## I. Background Facts and Proceedings.

Matthew Jahnke is a U.S.-born Caucasian male of Polish descent. Jahnke began his employment with Deere in 1998. Jahnke was originally hired to work as an assembly manager in Waterloo, Iowa. Since then, he has been employed at various other locations within the Deere organization, including Springfield, Missouri; Ankeny, Iowa; and Harbin, China. In January 2011, Jahnke began a temporary expatriate work assignment as a project manager for a Deere subsidiary in Harbin, China.

---

[1]We will collectively refer to the defendants in this opinion as Deere.

This assignment was scheduled to continue until December 2014. Jahnke oversaw construction and startup of a new facility in the region known as Harbin Works. Thereafter, Jahnke served as the factory manager of Harbin Works once it began production.

Jahnke was employed at John Deere Des Moines Works in Ankeny, Iowa, when he accepted this expatriate assignment. When a United States citizen who works for Deere in the United States accepts an expatriate assignment, Deere assigns the employee to a home unit and host unit within its human resources systems. The home unit is the Deere location where the employee was located when he or she accepted the expatriate assignment. Thus, Jahnke's home unit was in Ankeny, Iowa. The home unit facilitates the international assignment paperwork, but it has minimal to no contact with the expatriate during the expatriate assignment. The home unit merely becomes the Deere unit where the employee last worked before the expatriate assignment commences. There is generally no established arrangement for the expatriate to return to the home unit upon completion of the expatriate assignment. Meanwhile, the host unit is the Deere location that the employee is assigned to as an international employee. In this case, the host unit was John Deere (China) Investment Co., Ltd. located in Beijing, China.

As a condition of this assignment, Jahnke was required to enter into an employment contract with the host unit, John Deere (China) Investment Co., Ltd. As part of this employment contract, Jahnke was required to live and work in Harbin, China. Jahnke agreed to strictly observe the laws and regulations of the Peoples Republic of China and the various rules and systems of the company (China), including but not limited to the Code of Business Conduct. The employment contract also gave the company the right to impose disciplinary punishment on the

employee for his or her violation of any of the rules and systems of the company. The host unit human resources department handled all human resource functions. This included, but was not limited to, handling all compensation, benefits, housing, vacation, and leave for its employees. As an expatriate, Jahnke was also eligible for benefits and compensation that were unavailable to United States citizens working for Deere within the United States. These additional benefits included additional compensation, a hardship allowance, a temporary living allowance, and income tax equalization and tax preparation for domestic and foreign tax returns. Deere placed Jahnke on its international payroll, which is administered at Deere World Headquarters in Moline, Illinois. The host unit was responsible for the expenses incurred in relocating Jahnke to China and for any business expenses incurred by Jahnke during the term of his employment.

Upon accepting his expatriate position in China, Jahnke sold his home in Urbandale, Iowa, and lived in China from January 2011 until July 2014. Starting around 2012, Jahnke maintained a post office box in Bettendorf, Iowa, to receive mail in Iowa. During his time working in China, no income that Jahnke received was attributable to employment in Iowa, and he did not file personal Iowa income tax returns. In 2013, during the time Jahnke was living in China, he purchased a condominium in Florida. As part of his loan application, he stated this condominium would be his primary residence. Also in 2013, Jahnke copurchased a townhouse in Australia with a Chinese citizen. On his mortgage application and purchase contract, Jahnke claimed that his primary residence was Beijing, China.

In June 2014, Jahnke became the subject of an investigation into his relationship with a Chinese, female subordinate. This investigation

was conducted by international Deere employees working in China who made up the China Compliance Committee.[2] The investigation initially focused on the reported sexual relationship between Jahnke and Xu Meiduo, a twenty-eight-year-old Chinese woman who worked in the Harbin factory as a contracted language tutor. Jahnke had reported this relationship to his human resources manager and the Deere compliance hot line around February 2014. Further investigation revealed that Jahnke was also in an on-again, off-again sexual relationship with another Deere employee, Diana Pei, which began in 2011. Pei, a Chinese woman, was around thirty-six years old and worked as a financial controller for the Jiamusi, China factory when their relationship began. However, Pei was also assigned to assist Jahnke and the Harbin factory finance manager during the fall of 2011 through February 2012. Pei also served as a compliance ambassador for Deere along with her other job responsibilities. Neither Jahnke nor Pei reported their relationship to anyone at Deere.

After the investigation was completed by the China Compliance Committee, the compliance committee recommended that Jahnke—then sixty-years old—be immediately removed from his position as factory manager at Harbin Works and repatriated back to the United States. This recommendation was the result of the committee's conclusion that Jahnke had engaged in sexual relationships with Chinese, female employees who were within his span of control pursuant to the Code of Business Conduct.

Following the investigation, the China Compliance Committee consulted with Laurie Simpson, the vice president and chief compliance

---

[2]The members of the China Compliance Committee at this time were Kara Fischer, China finance manager; Andrew Jackson, global human resources director; Danny MacDonald, security manager; Joanne Wang, China general counsel; and Jinghui Liu, China country manager.

officer at Deere headquarters in Moline, Illinois. She agreed with the conclusion of the committee that Jahnke had violated the Deere Code of Business Conduct by failing to timely disclose his sexual relationships with Pei and Meiduo. She also agreed with the proposed disciplinary action. Consequently, Deere directed Richard Czarnecki and Dr. Bernard Haas to travel to Beijing, China, to meet with Jahnke.[3] Deere directed Czarnecki and Haas to inform Jahnke that he was being removed from his position as factory manager of Harbin Works and repatriated back to the United States. Czarnecki and Haas traveled to Beijing and met with Jahnke. They advised Jahnke that he was being removed from his position as factory manager of Harbin Works and would be repatriated back to the United States. Jahnke was advised that the action was being taken as discipline for his violation of the Deere Code of Business Conduct. It was unknown at that time where Jahnke would be reassigned. However, Jahnke was also considering retirement as an option.[4]

In July 2014, Jahnke repatriated back to the United States. Upon repatriation, Jahnke requested that Deere ship his personal belongings from Harbin to his Florida home. In August, Jahnke began a new assignment as the program manager at John Deere Waterloo Works in Waterloo, Iowa. Jahnke went from a grade 13 salary position as factory manager of Harbin Works to a grade 11 salary position as program manager in Waterloo.

---

[3]Richard Czarnecki was the global director of large tractor products, and Dr. Bernard Haas was the senior vice president for ag and turf global platform tractors. Both of these individuals were based at Deere World Headquarters located in Moline, Illinois.

[4]Following the investigation, Deere also provided Pei with a warning and counselling for her role in the violation. Deere did not discipline Xu Meiduo for her relationship with Jahnke, as she was a contract employee.

On August 12, Jahnke filed a complaint with the Iowa Civil Rights Commission (ICRC). In the complaint, Jahnke claimed the decision to remove him from his position as factory manager of Harbin Works and repatriate him to the United States, as well as the decision to place him in a position with a lower pay grade, was motivated by discrimination based on his age, national origin, and sex. On April 24, 2015, Jahnke filed suit under the Iowa Civil Rights Act (ICRA), alleging Deere subjected him to employment discrimination based on his age, sex, and national origin. He claimed Deere disciplined him more harshly than the female employees with whom he had sexual relationships. Jahnke also alleged Deere disciplined him more harshly than it did the Deere employees of Chinese national origin who had engaged in comparable conduct. Moreover, he alleged Deere made its disciplinary decisions based on impermissible stereotypes regarding his age.

Deere moved for summary judgment on July 14, 2016, arguing the ICRA does not apply extraterritorially and the alleged discriminatory acts occurred entirely outside of Iowa. The district court denied summary judgment, stating,

> It is well-established, "a statute is prima facie operative only as to the persons or things within the territorial jurisdiction of the lawmaking powers which enacted it." This summary judgment record clearly establishes that both parties have sufficient contact with the State of Iowa in order for the Iowa Civil Rights Act to have territorial effect. On this issue, Defendants' Motion for Summary Judgment is DENIED.

Deere applied for interlocutory appeal from the denial of their motion for summary judgment, which we granted. On appeal, Deere argues the ICRA does not apply extraterritorially and that Jahnke was not within the geographic reach of the ICRA as a United States citizen working abroad in China.

## II. Standard of Review.

"We review a district court ruling on a motion for summary judgment for correction of errors at law." *Homan v. Branstad*, 887 N.W.2d 153, 163 (Iowa 2016). Summary judgment is proper when the moving party has shown "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* When the district court ruling on a motion for summary judgment presents a "legal question involving statutory interpretation," our standard of review on the statutory interpretation issue is for correction of errors at law. *Id.* at 164.

## III. Analysis.

Deere presents two arguments on appeal. First, Deere maintains the district court erred in denying their motion for summary judgment because the ICRA does not apply extraterritorially. Second, Deere argues Jahnke was not within the geographic reach of the ICRA because he was a U.S. citizen working abroad. We address each of these arguments accordingly.

**A. The Extraterritorial Reach of the ICRA.** While Deere claims the ICRA does not have extraterritorial reach, there is dispute between the parties about whether applying the ICRA to this case would even require extraterritorial application. Jahnke claims he is not seeking extraterritorial application since his case involves a citizen of Iowa, and there is a cause of action or rights that arose in Iowa, thereby allowing the district court to apply the ICRA territorially. Throughout these proceedings, Deere has consistently argued that the alleged discriminatory acts occurred entirely outside of Iowa and that the ICRA has no extraterritorial application. We granted interlocutory appeal based on these claims made in Deere's application for interlocutory appeal. Therefore, we will address whether the ICRA applies extraterritorially.

It is a well-settled presumption that state statutes lack extraterritorial reach unless the legislature clearly expresses otherwise. *Griffen v. State,* 767 N.W.2d 633, 636 (Iowa 2009); *State Sur. Co. v. Lensing,* 249 N.W.2d 608, 612 (Iowa 1977). We explained this presumption in *State Surety Co.,* stating,

> Unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country enacting it. To the contrary, the presumption is that the statute is intended to have no extraterritorial effect, but to apply only within the territorial jurisdiction of the state or country enacting it. Thus, an extraterritorial effect is not to be given statutes by implication. Accordingly, a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it. These rules apply to a statute using general words, such as "any" or "all," in describing the persons or acts to which the statute applies. They are also applicable where the statute would be declared invalid if given an interpretation resulting in its extraterritorial operation.

249 N.W.2d at 611 (quoting 73 Am. Jur. 2d *Statutes* § 359, at 492 (1974)).

This same presumption applies to federal statutes as well, for the United States Supreme Court has held that federal statutes apply only within the territorial jurisdiction of the United States unless Congress provides a clear indication of extraterritorial application. *Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247, 255, 130 S. Ct. 2869, 2877 (2010). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 255, 130 S. Ct. at 2878. Hence, the focus of our inquiry is whether the Iowa legislature has "clearly expressed or indicated" that the ICRA should apply extraterritorially through the statute's "language, purpose, subject matter, or history." *State Sur. Co.,* 249 N.W.2d at 611 (quoting 73 Am. Jur. 2d *Statutes* § 359, at 492). If not, the ICRA does not apply extraterritorially. *Id.*

Nothing in the language of the ICRA expressly states or indicates that it applies extraterritorially. While the ICRA does include certain broad terms and definitions, such as its definition of "employee" as "any person employed by an employer," we are not convinced this broad language evinces a legislative intent to apply the ICRA extraterritorially. Iowa Code § 216.2(6) (2015). Under our presumption against extraterritorial application, "a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it" even if the statute uses general words to describe the persons the legislation covers. *State Sur. Co.*, 249 N.W.2d at 611 (quoting 73 Am. Jur. 2d *Statutes* § 359, at 492).

Further, we have long made clear our presumption that a statute does not apply extraterritorially, and "we presume the legislature is aware of our cases that interpret its statutes" in accord with this presumption. *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013). In the past, when the Iowa legislature has intended for a statute to operate extraterritorially, it has explicitly indicated this intent within the terms of the statute. For example, the Iowa legislature overcame this presumption against extraterritoriality in the workers' compensation realm by expressly extending the state workers' compensation law beyond the borders of Iowa in a subchapter titled "Extraterritorial Injuries and Benefit Claims." Iowa Code §§ 85.71–.72. This statute affirmatively states that it applies to employees injured "while working outside the territorial limits of this state" if certain circumstances are met. *Id.* § 85.71.

Similarly, we have held that the Iowa Tort Claims Act (ITCA) applies extraterritorially because the statute contains explicit language indicating an intention for it to apply beyond the borders of Iowa. *Griffen,* 767 N.W.2d at 636. Specifically, the ITCA states, "[W]here the act or omission occurred

outside of Iowa and the plaintiff is a nonresident, the Polk county district court has exclusive jurisdiction to hear, determine, and render judgment" on claims filed under the ITCA. Iowa Code § 669.4. In contrast, the ICRA lacks similar language indicating an extraterritorial reach.

Another example of the Iowa legislature explicitly indicating its intent regarding the extraterritorial application of a statute is Iowa Code section 803.1, the state criminal jurisdiction statute. Section 803.1 provides that a person may be prosecuted in Iowa for conduct "outside this state" when "a result which constitutes an element of the offense[ ] occurs within this state." *Id.* § 803.1(1)–(2). In *State v. Rimmer*, we relied on that language in section 803.1 to hold the state could prosecute criminal defendants who placed phone calls from outside Iowa to the insurer's employee in an Iowa claims office to induce payment of a fraudulent insurance claim for an accident staged in Illinois. 877 N.W.2d 652, 675–76 (Iowa 2016). In doing so, we stated, "Our holding is consistent with the legislature's intent to enlarge Iowa's territorial jurisdiction." *Id.* No equivalent language appears in the ICRA.

"Statutory text may express legislative intent by omission as well as inclusion," and we may not read language into the statute that is not evident from the language the legislature has chosen. *State v. Iowa Dist. Ct.*, 730 N.W.2d 677, 679 (Iowa 2007). It is telling that the legislature has clearly indicated its intention for other Iowa statutes to apply extraterritorially by including specific language expressing this intent, yet declined to include comparable language in the ICRA. The Iowa legislature is aware of our presumption against extraterritoriality and has made this awareness clear in other Iowa statutes. Consequently, if the Iowa legislature wanted the ICRA to apply extraterritorially, it would have expressly indicated this intent in the statutory text. Yet, the Iowa

legislature did not do so, and it is not for us to alter the ICRA by expanding it to apply extraterritorially. *See id.*

Likewise, nothing in the purpose, subject matter, or history of the ICRA expressly states or indicates that the Iowa legislature intended for the statute to operate beyond the borders of the State of Iowa. The Iowa legislature enacted the ICRA in 1965 with the goal of creating equality in the workplace. *Pippen v. State,* 854 N.W.2d 1, 5, 9 (Iowa 2014). To accomplish this goal, the ICRA established the ICRC, which consists "of seven members appointed by the governor subject to confirmation by the senate" and a director "who shall serve as the executive officer." Iowa Code § 216.3. Thus, the ICRC is an administrative agency comprised of Iowans who are selected by Iowans and presided over by an Iowan that is tasked with the responsibility of enforcing the ICRA through an administrative process. *See id.*

As an administrative agency, the ICRC is "limited to the power granted by statute." *Brakke v. Iowa Dep't Nat. Res.,* 897 N.W.2d 522, 533 (Iowa 2017); *see also* Iowa Code § 17A.23(3). Iowa Code section 216.5 prescribes the authority of the ICRC and provides further support for our finding that the Iowa legislature never intended for the ICRA to apply extraterritorially. For example, the ICRA provides the ICRC with the authority to investigate discrimination "*in this state* and to attempt the elimination of such discrimination by education and conciliation." Iowa Code § 216.5(3) (emphasis added). It also authorizes the ICRC "[t]o issue such publications and reports of investigations and research as in the judgment of the commission shall tend to promote goodwill among the various racial, religious, and ethnic groups *of the state.*" *Id.* § 216.5(6) (emphasis added).

When the ICRC conducts proceedings to determine whether a respondent violated the ICRA, the Iowa Administrative Procedure Act governs those proceedings in contested cases. *Id.* § 216.15(8). Moreover, the ICRA emphasizes the duty of the ICRC to work with the Governor of Iowa and the Iowa legislature to accomplish the goals of the ICRA. *See, e.g.*, *id.* § 216.5(7) (making it a duty for the ICRC to annually "prepare and transmit" reports on the work it performs to the Governor and the Iowa legislature); *id.* § 216.5(8) (stating the ICRC has a duty "[t]o make recommendations to the general assembly for such further legislation concerning discrimination"). Part of accomplishing the goals of the ICRA includes promulgating administrative rules meant to deter discrimination, such as portions of the Iowa Administrative Code in which the ICRC acknowledges the geographic limitations of the ICRA to the territorial boundaries of Iowa. *See, e.g.*, Iowa Admin Code r. 161—8.15(3) (prohibiting any "newspaper or other publication published within the state of Iowa" from advertising employment notices that indicate age discrimination); *id.* r. 161—8.56(1) ("All newspapers within the state of Iowa shall cease to use sex-segregated want ads."). In summary, the ICRC "has been authorized by the legislature to interpret, administer, and enforce the Iowa Civil Rights Act to eliminate discriminatory and unfair practices in employment *in Iowa.*" *Rent-A-Center, Inc. v. Iowa Civil Rights Comm'n*, 843 N.W.2d 727, 734 (Iowa 2014) (emphasis added). Given the crucial role of the ICRC in enforcing and promoting the ICRA in Iowa, its lack of express extraterritorial reach further indicates the intention of the Iowa legislature for the ICRA to apply only within the State of Iowa.

Finally, there are strong policy considerations in favor of applying the presumption against extraterritoriality to the ICRA. Applying the ICRA extraterritorially creates the potential for conflicts with the laws of other

states and countries. The ICRA reflects the policy decisions of Iowa and imposing those state policy choices "on the employment practices of our sister states should be done with great prudence and caution out of respect for the sovereignty of other states, and to avoid running afoul of the Commerce Clause of the United States Constitution." *Union Underwear Co. v. Barnhart*, 50 S.W.3d 188, 193 (Ky. 2001) (applying the presumption against extraterritoriality in holding the Kentucky Civil Rights Act did not apply extraterritorially). These interstate comity concerns and conflict-of-laws issues have led a majority of courts to decline to extraterritorially apply human rights-related statutes beyond their clear geographic reach. *See, e.g., E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 259, 111 S. Ct. 1227, 1236 (1991) (declining to apply a former version of Title VII extraterritorially); *Ferrer v. MedaSTAT USA, LLC*, 145 F. App'x 116, 120 (6th Cir. 2005) (holding the Kentucky Civil Rights Act did not apply extraterritorially); *Judkins v. St. Joseph's Coll. of Me.*, 483 F. Supp. 2d 60, 65 (D. Me. 2007) (declining to apply the Maine Human Rights Act where the alleged discriminatory acts took place outside of Maine). Like these courts, we are unwilling to expand the reach of the ICRA to apply extraterritorially since there is not clear evidence of legislative intent to do so.

Nevertheless, our inquiry does not end here, as the district court found extraterritorial application of the ICRA was unnecessary in this case since the territorial jurisdiction of the ICRA extended to "persons or things within the territorial jurisdiction of the lawmaking power which enacted it." The district court subsequently denied summary judgment, noting the "summary judgment record clearly establishes that both parties have sufficient contact with the State of Iowa in order for the Iowa Civil Rights Act to have territorial effect." Thus, we next address Deere's claim that

the district court incorrectly relied on the parties' contacts with Iowa in finding that the ICRA has territorial effect in this case.

**B. The Territorial Boundaries of the ICRA.** Deere maintains the district court erred in finding the ICRA has territorial effect in this case based on the parties' contacts with Iowa. In response, Jahnke asserts the ICRA applies territorially so long as "the case involves citizens of Iowa or a cause of action or rights that arose in Iowa," even if some of the conduct at issue occurred outside of Iowa or the United States. Thus, Jahnke reasons, the ICRA applies to his case because it involves an Iowan working "on temporary assignment in China, who was discriminated against by Iowans who made their discriminatory decisions in Iowa."

The underlying claim in this case is a disparate-treatment discrimination claim under the ICRA. A complainant bringing such a claim must show a discrete discriminatory employment action that took place within the scope of employment in Iowa. *See Dindinger v. Allsteel, Inc.*, 860 N.W.2d 557, 570 (Iowa 2015); *Rent-A-Center, Inc.*, 843 N.W.2d at 734; *see also* Iowa Code § 216.6. This requirement coincides with the structure, purpose, and language of the ICRA, and it calls for us to examine where the focus of the relationship between the employee and employer took place to determine whether it is reasonable to conclude the ICRA applies.

Iowa Code section 216.2(7) defines an employer as any entity or person "employing employees within this state." Iowa Code § 216.2(7). Since the term "employing" and "employees" weld together into a single concept of "employing employees," it is necessary to explore where the core of the *employment relationship* is located. In making the determination of where the employment relationship is located, the location of the employee at the time of the alleged civil rights violation is an important, but not

necessarily determinative, factor. The location of the employer may also be germane, depending upon the facts and circumstances. For example, suppose sexual harassment that occurs on a construction crew working in Nebraska is reported to the main office of an employer in Des Moines, but the Iowa employer takes no action. Is there an Iowa civil rights claim against that Iowa employer even though the harassment occurred in Nebraska? Would it matter if the crew were on a temporary assignment in Nebraska? Would it matter that the alleged harassment was part of a continuing course of conduct, some in Iowa and some in other states? Thus, the mere location of the employee at the time of the alleged incident of discrimination is not always determinative of the question of whether the alleged unlawful event involved a person or entity "employing employees in this state," at least when the employer making the decisions related to the alleged unlawful conduct is located in Iowa.

Yet, in this case, the location of both the employee and the employer demonstrates that the ICRA is not applicable since the crux of the employment relationship between Jahnke and Deere was rooted in China, and perhaps Illinois, rather than Iowa. At the time of the alleged discriminatory employment action, Jahnke lived and worked in China for the Deere subsidiary that operated in China under Chinese laws. Jahnke was operating under an employment contract that was to be performed in China. It required Jahnke to live and work in China in order to meet his employment obligations. As the annual Deere Performance Management Appraisal described his position, Jahnke was "responsible for the operation of the Harbin factory in northeast China and either through solid or dotted line, responsible for all the functions due to the location." Additionally, while he did occasionally return to Iowa as part of his responsibilities as the factory manager of Harbin Works, he also

occasionally worked with people in various locations internationally since Harbin Works planned the assembly for three product platforms. Nonetheless, the scope of his position was "a unit based role." Because Jahnke's host unit was in China, his employment was based in China, where he dealt with issues unique to China. Though Czarnecki and Haas reside in Scott County, Iowa, each of these individuals work out of the Deere World Headquarters located in Moline, Illinois. Mere residency in Iowa by Czarnecki and Haas cannot lead to the inference that the crux of the employment relationship between Deere and Jahnke is rooted in Iowa.

Because of this geographical limitation on the ICRA, we cannot agree with the district court that the ICRA applies to this case simply due to the parties' contacts with Iowa. The district court erroneously expanded the ICRA beyond its reach by applying the ICRA merely because the parties have "sufficient contact with the State of Iowa." For many of the same reasons the ICRA does not apply extraterritorially, the ICRA does not apply to employment actions that occurred outside of Iowa solely because some of the people involved in those actions may have had contact with Iowa.

The portion of the ICRA governing venue also demonstrates that the ICRA does not apply to this case. Under the ICRA, venue is proper "in the county in which the respondent resides or has its principal place of business, or in the county in which the alleged unfair or discriminatory practice occurred." *Id.* § 216.16(5). Jahnke's petition does not support his claim that Iowa, or more specifically Polk County, is the proper venue for his employment discrimination claim. Iowa is not the principal place of business for Deere. The only connection with Polk County was that John Deere Des Moines Works was the last place that Jahnke worked prior to his expatriation to China. As his home unit, it performed all of the necessary paperwork to complete the expatriation in 2011. Other than

that, there was no further involvement by the home unit during the time Jahnke was employed in China, and no one at the home unit was involved in the decision to remove Jahnke from his position of factory manager and repatriate him to the United States.

Jahnke also fails to point to any discrete discriminatory employment action taken in Polk County, and the record discloses none. All of the alleged adverse employment actions Jahnke complains of occurred in China or Illinois. Jahnke was repatriated back to the United States due to alleged misconduct he engaged in with Chinese Deere employees in China. This misconduct, and the investigation of this misconduct, was conducted in China by members of the China Compliance Committee who all lived in China while working for John Deere (China). This compliance committee generally handles compliance issues surrounding Deere employees who work in China. When the China Compliance Committee conducts a compliance case, it decides whether an employee violated any corporate policies, the depth of any violations, and the ramifications of such violations. In some cases, it will consult Deere's corporate compliance committee in Moline, Illinois, before reaching a conclusion, similar to what occurred here. But the overwhelming responsibility to conduct investigations and make recommendations based on those investigations, falls within the purview of the China Compliance Committee.

In addition to the considerable evidence demonstrating that the alleged adverse employment actions took place outside of Iowa, the record does not support the connection Jahnke claims exists between Iowa and the alleged employment discrimination at issue. For example, on his ICRC complaint form, Jahnke lists "825 SW Irvinedale Drive, Ankeny, Iowa 50023 and China" as "the address of the location where the discrimination

occurred." While Ankeny was Jahnke's home unit that set up his contract with Deere's China subsidiary, nothing in the record links Deere's employment decisions about Jahnke to his Ankeny home unit. The Deere location in Ankeny helped Jahnke with administrative tasks, such as initiating his international assignment paperwork, but his Deere unit of operation and assignment for management responsibilities was in China.

Jahnke claims "[a] reasonable jury can find Czarnecki and Haas were the ones responsible for [his] demotion and repatriation [and that t]hey made those decisions from Iowa." However, Jahnke does not provide any citations to the record to support this conclusion, and the record itself is devoid of any evidence that Czarnecki or Haas played any role in the investigation of Jahnke or the ultimate recommendation by the China Compliance Committee to remove Jahnke as factory manager and repatriate him to the United States. It is clear from the record that these decisions came from the members of the Deere compliance committees in China and Moline. It was only at that time that Czarnecki and Haas, as the managers who Jahnke reported to, were instructed to travel to China to inform Jahnke of the decision to remove him as factory manager and inform him of his repatriation to the United States. This is exactly what they did. Likewise, Jahnke does not provide any citations to the record to support that any of these employment decisions were made from Iowa.

When Czarnecki was deposed, he testified that the compliance department had already reached its conclusion regarding whether Jahnke participated in inappropriate relationships. Czarnecki was merely informed of the relationships and the conclusions of the compliance department. When asked whether he participated "in the decision to decide what the consequences should be," Czarnecki stated he had only engaged in discussions on how the decision to repatriate Jahnke would be

executed since he was responsible for discussing this with Jahnke. He also explained that Laurie Simpson, who served as vice president and chief compliance officer for the Deere Compliance Committee, decided the appropriate action for Jahnke. Simpson, who is based at the Deere World Headquarters in Moline, Illinois, based her decision on the results of the investigation performed by the China Compliance Committee and its recommended action. While Jahnke tries to compare his 2014 performance appraisal that Czarnecki completed to Pei's performance appraisal to support his disparate treatment claim, the two appraisals are not comparable since Shican Zhang—not Czarnecki—completed Pei's appraisal. The only input Czarnecki had regarding Jahnke came after Deere had already decided to remove him from his factory manager position and repatriate him back to the United States. Following this decision, Czarnecki was involved in finding suitable employment for Jahnke back in the United States.

Similarly, the deposition of Haas confirms that he did not take part in any investigation of Jahnke, nor did he have any input into the conclusion of the China Compliance Committee or its recommendations. When Jahnke's attorney questioned Haas about his role in deciding how to punish Jahnke following the investigation, Haas testified he did not play a role in making that decision. Haas testified that the compliance committee was responsible for deciding whether Jahnke violated Deere policy and the resulting punishment for any violation. Haas further explained that he had never even seen a copy of the investigation report on Jahnke, and he still had not seen a copy of it at the time of his deposition. Like Czarnecki, the only role Haas played in repatriating Jahnke back to the United States was informing Jahnke that he was no longer the factory manager of Harbin Works and that he was going to be

repatriated back to the United States. Similar to Czarnecki, he was involved in decisions regarding employment for Jahnke with Deere in the United States following Jahnke's repatriation.

Overall, the documents and testimony in the record demonstrate that Czarnecki and Haas did not participate in the compliance investigation involving Jahnke, nor were they involved in the ultimate decision to discipline Jahnke for his alleged inappropriate relationships. The record also shows Czarnecki and Haas never read the compliance investigation summary detailing Jahnke's alleged misconduct, and they played no part in deciding how or whether the female employees who were in relationships with Jahnke would be disciplined. What the record does reflect is that the China Compliance Committee, located in China, and the Deere Compliance Committee, located in Moline, Illinois, decided to investigate Jahnke for alleged violations of the Code of Business Conduct. What the record also reflects is that as a result of this investigation in China, the China Compliance Committee concluded there had been a violation of the Code of Business Conduct based on Jahnke engaging in sexual relationships with two, female Chinese nationals who also worked for Deere in China. The compliance committee also concluded that these female employees worked with and under Jahnke while he was the factory manager of Harbin Works in Harbin, China. As a result of its investigation and conclusions, it recommended that Jahnke be removed as factory manager and repatriated to the United States. As noted above, this recommendation was accepted by the Deere Compliance Committee located in Moline. There is nothing in the record to support Jahnke's notion that "[i]t is icing on the cake that at least some of the illegal acts took place in Iowa," based on his unsupported assertion that Czarnecki

and Haas made the decisions from Iowa to remove him from his position as factory manager in China and repatriate him to the United States.

Nothing in this record supports a conclusion that the focus of this employment relationship was Iowa. Similarly, Jahnke cannot show that any discrete discriminatory employment action took place in Iowa. The only ties that Jahnke had to Iowa were intermittent trips to Iowa while he was living and working in China and a post office box to receive mail. The fact that Czarnecki and Haas had residences in Iowa, or that Deere had operations in Iowa, is also unpersuasive. Nothing in the ICRA demonstrates an intent for the ICRA to apply to discrimination claims made against an employer simply because of the parties' tangential relations with Iowa in cases where the alleged discrimination took place outside of Iowa. *See Rent-A-Center, Inc.*, 843 N.W.2d at 734. (The ICRC "has been authorized by the legislature to interpret, administer, and enforce the Iowa Civil Rights Act to eliminate discriminatory and unfair practices in employment in Iowa.").

Moreover, nothing in the ICRA recognizes domicile or residence as the standard to determine whether the ICRA applies to employment discrimination claims as Jahnke contends. The only reference to "domicile" in the ICRA is in the definition of "familial status" as "one or more individuals under the age of eighteen domiciled with" certain designated family members. Iowa Code § 216.2(9)(*a*). That provision is inapplicable to the portion of the ICRA prohibiting unfair employment practices. *See id.* § 216.6(1). Meanwhile, the rest of the ICRA contains no requirement for a complainant to have an Iowa domicile or residence, nor does it exclude a complainant that lacks an Iowa residence or domicile.

> Although our legislature may have a strong interest to enact
> [employment laws] to protect nonresidents when they cross

our border to perform work in Iowa, it would have no strong interest in protecting nonresidents in those instances where they perform work outside of Iowa.

*Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 589 (Iowa 2002) (Cady, J., concurring).

At the time of the alleged discriminatory acts, Jahnke was residing in China and performing work in China. Jahnke had no demonstrable ties to Iowa. In fact, at the time of the alleged discriminatory acts, Jahnke's most significant ties were in China, Florida, or Australia, where he then had residences. He had no such residence in Iowa. The alleged discriminatory acts also took place outside of Iowa. The only connection to Iowa in this situation occurred after the alleged discriminatory conduct occurred when he was assigned to Waterloo, Iowa, upon repatriation back to the United States. The Iowa legislature has not indicated or specified an intent or interest to protect "nonresidents in those instances where they perform work outside of Iowa" from alleged unfair employment practices that took place outside of Iowa. *Id.*

Additionally, like applying the ICRA extraterritorially, applying the ICRA to claims involving employees who perform work outside of Iowa simply due to the contacts that the parties have with the State of Iowa would create interstate comity concerns and conflict-of-laws issues. To illustrate, the ICRA recognizes sexual orientation and gender identity as protected classes in the employment discrimination context while our western neighbors in Nebraska and South Dakota do not. *Compare* Iowa Code § 216.6(1)(*a*) (including "sexual orientation" and "gender identity" as protected classes under the ICRA from unfair or discriminatory employment practices), *with* Neb. Rev. Stat. Ann. § 48-1104 (West, Westlaw through April 18, 2018 of the 2d Reg. Sess. of the 105th Leg.) (establishing the following protected classes under the state employment

discrimination statute: "race, color, religion, sex, disability, marital status, or national origin"), *and* S.D. Codified Laws § 20-13-10 (Westlaw through 2018 Reg. Sess.) (stating it is unlawful for an employer to discriminate "because of race, color, creed, religion, sex, ancestry, disability, or national origin"). Yet, if the ICRA is applied based on tangential contacts such as the domicile of the employee bringing suit, an Iowan who is employed in Nebraska or South Dakota could potentially have viable claims of sexual orientation or gender identity discrimination against a non-Iowa employer under the ICRA. These discrimination claims would be based on actions that happened wholly outside of Iowa and without any discernible ties to an Iowa employer. This sort of situation demonstrates the interstate comity concerns that could arise by applying the ICRA too broadly based on a party's contacts with Iowa. This is also consistent with the language of the statute.

Finally, declining to apply the reach of the ICRA in this case does not leave employees in a similar situation to Jahnke without a remedy. Jahnke argues that he was the victim of unfair employment practices that occurred in China and Moline, Illinois. Jahnke could have brought alternative employment discrimination claims under Title VII and the Age Discrimination in Employment Act (ADEA). *See* 29 U.S.C. § 630(f) (2012); 42 U.S.C. § 2000e(f). Likewise, it is possible that Jahnke may have had a claim under the Illinois Human Rights Act or the laws in China. *See, e.g.*, 775 Ill. Comp. Stat. Ann. § 5/1-103(A) (West, Westlaw through P.A. 100-585 of 2018 Reg. Sess.). Ultimately, he chose to forego these options and pursue a claim under the ICRA despite the fact that the alleged discriminatory actions took place outside of Iowa.

In conclusion, the ICRA does not apply extraterritorially because it contains no clear and affirmative expression or indication of an

extraterritorial reach. Likewise, the ICRA does not apply in this case because the plaintiff has failed to show either that the employee or the employer was located within Iowa for purposes of the alleged discriminatory act. Mere Iowa residency and the presence of some ties to Iowa is insufficient to establish that the employment relationship is located "in this state." With respect to the employer, decisions related to the plaintiff were made in China, and perhaps in Moline, Illinois, but not in Iowa. The mere filing of paperwork in Ankeny, Iowa, and the residence of corporate executives in Iowa do not establish an employment relationship in Iowa in any functional way. Under these circumstances, the plaintiff may have a federal civil rights claim and may have a claim under Illinois law, but he has no claim under the Iowa Civil Rights Act.

### IV. Conclusion.

For the aforementioned reasons, we reverse the decision of the district court and remand to the district court for entry of summary judgment in favor of Deere.

**REVERSED AND REMANDED.**

All justices concur except Hecht and Mansfield, JJ., who take no part.