# IN THE SUPREME COURT OF IOWA

No. 18–2076

Filed May 22, 2020

**JEFFERIE SCOTT GRAY, JANICE GRAY,** and **J.G.,** as Successors in Interest to JAMES LEE HOHENSHELL**,**

Appellants,

vs.

**MICHAEL B. OLIVER, OLIVER LAW FIRM, P.C.,** and **OLIVER GRAVETT LAW FIRM, P.C.,**

Appellees.

Appeal from the Iowa District Court for Polk County, Jeanie Kunkle Vaudt, Judge.

Appeal from the grant of summary judgment dismissing action for legal malpractice. **AFFIRMED.**

Jonathan Kramer and Zachary James Hermsen of Whitfield & Eddy, P.L.C., Des Moines, for appellants.

Joseph A. Cacciatore of Ervanian & Cacciatore, L.L.P., Des Moines, for appellees.

**McDONALD, Justice.**

The narrow question presented in this appeal is whether judgment creditors can levy on their judgment debtor, obtain the judgment debtor's chose in action for legal malpractice against the attorney representing the judgment debtor in the litigation giving rise to the judgment, and prosecute the claim for legal malpractice against the attorney as the successors in interest to their judgment debtor. For the reasons expressed below, we conclude the judgment creditors cannot prosecute the legal malpractice claim as successors in interest to their former litigation adversary.

I.

The facts of this case are not disputed. In 2013, James Hohenshell's stepdaughter invited some of her girlfriends to the Hohenshell home for a party. One of the girls was thirteen-year-old J.G. Hohenshell provided alcohol to J.G. and the other girls. After J.G. became intoxicated and sick, Hohenshell carried J.G. to his bedroom and forcibly raped her. In November 2014, Hohenshell pleaded guilty to one count of committing lascivious acts with a minor and five counts of providing alcohol to a minor and was sentenced to incarceration. "At the guilty-plea proceeding, Hohenshell entered his plea with a smirk on his face and a chuckle." *Gray v. Hohenshell*, No. 17–1100, 2019 WL 325015, at *2 (Iowa Ct. App. Jan. 23, 2019).

In August 2015, Janice and Jeff Gray, individually and as parents and next friends of J.G., filed a civil suit against Hohenshell. They asserted claims for: "(1) assault, sexual assault, and battery; (2) intentional infliction of emotional distress; (3) negligent infliction of severe emotional distress; (4) negligent supervision; and (5) loss of services and consortium." *Id.* at *2. Hohenshell hired Michael Oliver of the Oliver Law Firm, P.C., and its successor Oliver Gravett Law Firm, P.C., to defend the suit.

Hohenshell did not contest liability. The parties tried the issue of damages to a jury. The jury awarded compensatory damages to J.G. in the amount of $50 million, loss of consortium damages to each parent in the amount of $1 million, and punitive damages in the amount of $75 million. The total verdict was $127 million.

It would be fair to say Oliver did not vigorously defend the suit. The Grays offered to settle the suit for a confession of judgment in the amount of $2 million or for an amount "well into the six figure range" that included evidence of an ability to pay. Oliver did not respond to the Grays' settlement demands. Oliver did not conduct any discovery. Oliver did not resist the Grays' motions for summary judgment with respect to liability. Oliver did not resist the admission of the Grays' trial exhibits. Oliver did not make any objections to the Grays' prospective juror questionnaires. Oliver did not provide juror questionnaires of his own. Oliver did not put on much of a defense at the trial on damages. Oliver did not put on any evidence on Hohenshell's behalf. It would also be fair to say there may have been legitimate reasons for Oliver's inaction. The record is silent on the issue.

Hohenshell retained new counsel after trial in the civil suit and sought appellate relief. On appeal, Hohenshell argued "(1) the verdict was influenced by passion or prejudice, (2) the compensatory damages award was not supported by the evidence, and (3) the punitive damages award was excessive and violate[d] his due process rights." *Id.* at *1. The Grays vigorously defended the award on appeal. They argued it would be an affront to justice to disturb the civil award:

> [Hohenshell] is asking this Court to agree with him that while raping a child may not be good, . . . it's not $127,000,000 bad. He is further asking that if the Court agrees with this astounding assertion, it should then substitute its judgment

of such heinous acts for the jury's and thereby put a defacto [sic] arbitrary ceiling on what a jury can award as a verdict when a defendant rapes a child. [The Grays] believe this assertion and request is abhorrent, contrary to the very tenants upon which the civil justice system was created and cultivated, and an affront to justice.

They further argued, "The jury award is not the shocking part of this case. It is the reprehensible and vile actions of [Hohenshell] that shock the conscience. The jury award is absolutely commensurate to the acts." The court of appeals agreed with the Grays, and it affirmed the civil judgment against Hohenshell. *See Hohenshell*, 2019 WL 325015, at *11.

While the appeal from the Grays' suit against Hohenshell was pending, the Grays caused to be issued a writ of execution on the $127 million judgment against Hohenshell. The sheriff levied on the following property belonging to Hohenshell:

All right, title and interest of James Lee Hohenshell in Claims of any Kind or Nature against Michael Oliver, against Oliver Law Firm, PC, or against Oliver Gravett Law Firm, PC, each at 974 73rd Street, #10, Windsor Heights, Iowa 50324.

The Grays purchased this right for $5000 at the sheriff's sale. At the time the Grays executed on their judgment and purchased Hohenshell's claims against Oliver, Hohenshell had not asserted any claim for legal malpractice against Oliver, nor has he ever, according to the record.

In November 2017, while the Grays were still defending the $127 million judgment against Hohenshell on appeal, they filed this malpractice claim against Oliver as successors in interest to Hohenshell. In their petition, they asserted three counts against Oliver: legal malpractice, breach of fiduciary duty, and breach of written contract. All of the claims arose out of and related to Oliver's representation of Hohenshell in the Grays' suit against Hohenshell. The Grays asserted Oliver "was negligent in failing to persuade" Hohenshell to confess

judgment or otherwise settle their suit. The Grays asserted Oliver provided an inadequate defense of Hohenshell in their suit against Hohenshell. The Grays claimed Oliver's malpractice "proximately caused damages to Hohenshell equal to the greater of either the amount the jury award in the lawsuit exceeded the value of such award were counsel to have represented Hohenshell with competence or the value of Hohenshell's payments to Oliver."

Oliver sought summary judgment on all claims asserted against him. He contended public policy considerations precluded the involuntary assignment of Hohenshell's legal malpractice claim to Hohenshell's adversaries in the very suit that gave rise to Hohenshell's chose in action. The district court granted Oliver's motion for summary judgment. The district court held that "as a matter of law the public policy of the State of Iowa prohibits the assignment of a legal malpractice claim to an adversarial party in the underlying lawsuit." The Grays filed a motion to enlarge or amend, which the district court denied. The Grays timely filed this appeal.

## II.

We "review a district court ruling on a motion for summary judgment for correction of errors at law." *Wells Fargo Equip. Fin., Inc. v. Retterath*, 928 N.W.2d 1, 5 (Iowa 2019) (quoting *Jahnke v. Deere & Co.*, 912 N.W.2d 136, 141 (Iowa 2018)). "Summary judgment is appropriate 'when the moving party has shown "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." ' " *Id.* (quoting *Jahnke*, 912 N.W.2d at 141).

## III.

The Grays contend the district court erred in granting Oliver's motion for summary judgment. First, they contend the district court

lacked the power to determine a question of public policy. Second, they contend it is contrary to Iowa law to disallow the assignment and prosecution of a claim for legal malpractice. Third, they contend disallowing the assignment and prosecution of a claim for legal malpractice is unconstitutional. We address each contention in turn.

A.

The Grays first argue the district court did not have "the power, without prior precedent or statutory authority, to establish new public policies or to interpret unwritten public policies of the State of Iowa in the first instance." They argue this power is specifically reserved for the supreme court. In support of their argument, the Grays rely on article V of the Iowa Constitution, which establishes the judicial department.

The Grays' argument is a nonstarter. The district court had the constitutional and statutory authority to resolve the viability of the Grays' legal claim. The Iowa Constitution provides, "The district court shall be a court of law and equity . . . and have jurisdiction in civil and criminal matters arising in their respective districts, in such manner as shall be prescribed by law." Iowa Const. art. V, § 6. The Iowa Code provides, "The district court has all the power usually possessed and exercised by trial courts of general jurisdiction . . . ." Iowa Code § 602.6101 (2018). Determining the merits or demerits of a common law issue based on considerations of public policy is a question of law within the constitutional and statutory power of the district court. *See, e.g.,* *33 Carpenters Constr., Inc. v. State Farm Life & Cas. Co.,* 939 N.W.2d 69, 81 (Iowa 2020) (upholding district court's finding that a contract was void as a matter of public policy); *Lloyd v. Drake Univ.,* 686 N.W.2d 225, 226 (Iowa 2004) (upholding district court's finding that defendant's actions did not violate public policy); *Fitzgerald v. Salsbury Chem., Inc.,* 613 N.W.2d

275, 282 (Iowa 2000) ("It is generally recognized that the existence of a public policy . . . presents questions of law for the court to resolve."). Indeed, we have held such questions "are generally capable of resolution by a motion for summary judgment." *Fitzgerald*, 613 N.W.2d at 282.

The Grays' argument is a nonstarter for an obvious additional reason. The Grays claim the determination of public policy is a power specifically reserved to this court. The matter is now before this court, and this court reviews the question of law independently. The Grays' argument does not provide a basis to reverse the judgment of the district court when they concede this court can and should answer the question presented. The Grays' argument is effectively moot.

The district court's grant of summary judgment on the legal question presented was within its constitutional and statutory power. The Grays' arguments regarding the power of the district court is without merit.

B.

We next consider whether the Grays, as successors in interest to Hohenshell, may prosecute Hohenshell's chose in action for legal malpractice against Oliver for claims arising out of Oliver's representation of Hohenshell in the suit in which the Grays and Hohenshell were adverse.

As a general rule, a judgment creditor may enforce its judgment by execution and levy on a chose in action. "Judgments or orders requiring the payment of money . . . are to be enforced by execution." Iowa Code § 626.1. A judgment creditor may demand issuance of an execution "[u]pon the rendition of judgment." *Id.* § 626.7. The execution may direct the sheriff to levy on a variety of things, including "[j]udgments, money, bank bills, and other things in action." *Id.* § 626.21. A thing in action includes a chose in action. *See Chrysler Credit Corp. v. Rosenberger*, 512 N.W.2d 303, 304 (Iowa 1994) (stating "a cause of action is one of the 'other

things in action' that may be" levied upon (quoting Iowa Code § 626.21 (1991))); *Arbie Mineral Feed Co. v. Farm Bureau Mut. Ins.*, 462 N.W.2d 677, 680 (Iowa 1990) ("A 'chose in action' is the same thing as a 'thing in action['] . . . . [And a] cause of action is in existence prior to judgment and is personal property upon which, under Iowa law, a creditor may levy." (citation omitted) (quoting *Brenton Bros. v. Dorr*, 213 Iowa 725, 733–34, 239 N.W. 808, 811–12 (1931))); *Citizens State Bank of Des Moines v. Hansen*, 449 N.W.2d 388, 389 (Iowa 1989) (stating a thing in action, "though not subject to levy at common law, [can] be reached by execution under [Iowa law]").

The Grays' acquisition of Hohenshell's chose in action by execution, levy, and sale effected an involuntary assignment of Hohenshell's legal malpractice claim. *See, e.g.*, *McGarry v. Eckert*, 246 Iowa 70, 76, 67 N.W.2d 1, 4 (Iowa 1954) (noting the "broad distinction between alienation by the voluntary act of the owner" and the "involuntary assignment made by compulsion of law" (quoting *Henderson v. Harness*, 52 N.E. 68, 70 (Ill. 1898))). As involuntary assignees of Hohenshell's legal malpractice claim, the Grays stepped "into the shoes of the assignor upon assignment of the interest and [took] the assignment subject to the defenses assertable against the assignor." 6A C.J.S. *Assignments* § 133, at 494 (2016); *see Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995) ("On the other hand, the assignee also takes the property subject to all defenses to which the assignor is subject."). As involuntary assignees of Hohenshell's legal malpractice claim, the Grays also took the assignment subject to any additional limitations on the legal malpractice claim that might render the involuntary assignment void, voidable, or otherwise not enforceable. *See* 6A C.J.S. *Assignments* § 133, at 494. These additional limitations include, among others, those inherent in the nature of the chose in action at issue.

The question presented is thus whether the chose in action for legal malpractice is subject to a limitation that renders the assignment unenforceable. We briefly addressed this issue in *Crookham v. Riley*, 584 N.W.2d 258 (Iowa 1998). That case involved a claim for legal malpractice, and one of the questions presented involved a challenge to the real party in interest. *Id.* at 264. In resolving that issue, we concluded we "need not decide if a legal malpractice claim is assignable." *Id.* We noted, however, "Based on public policy considerations it has been held that malpractice claims should not be held subject to assignment." *Id.* at 264 n.1. Although we identified the issue of assignability in *Crookham*, we never decided the issue.

While the question presented in this appeal is a question of first impression for our court, numerous other jurisdictions have addressed the question of whether a claim for legal malpractice is subject to assignment and prosecution by an assignee. The seminal case is *Goodley v. Wank & Wank, Inc.*, 133 Cal. Rptr. 83 (Ct. App. 1976). In *Goodley*, the court identified a number of policy considerations that militated against allowing the assignment and prosecution of a legal malpractice claim. *See id.* at 86–88. A number of other jurisdictions have also considered the question. *See* George L. Blum, Annotation, *Assignability of Claim for Legal Malpractice*, 64 A.L.R. 6th 473, 493–94 (2011). The vast majority of other jurisdictions have followed *Goodley* and prohibited the assignment and prosecution of legal malpractice claims. *See Skipper v. ACE Prop. & Cas. Ins.*, 775 S.E.2d 37, 37 (S.C. 2015) (stating the majority rule is to prohibit assignment); 6 Am. Jur. 2d *Assignments* § 57, at 197 & n.3 (2018) (stating "[m]ost jurisdictions have held that legal malpractice claims are nonassignable" and citing cases).

The relevant cases identify a surfeit of reasons for concluding a claim for legal malpractice is not subject to assignment and prosecution by an assignee: (1) assignment divests the client of the decision to sue; (2) assignment imperils the sanctity of the attorney–client relationship; (3) assignment erodes the attorney–client privilege; (4) assignment compromises zealous advocacy and the duty of loyalty; (5) assignment degrades the legal profession and the public's confidence in the court system by sanctioning an abrupt and shameless shifting of positions; (6) assignment restricts access to legal services by the poor or indigent; and (7) assignment creates a commercial market for legal malpractice claims.

These reasons apply with greater force where, as here, the assignment was involuntary and the claim arises out of the litigation in which the parties were adverse. First, the involuntary assignment of a legal malpractice claim divests the client, the party actually harmed, of the decision to assert or forego a claim against his lawyer. "The decision to bring a legal malpractice action 'is one peculiarly vested in the client.'" *Alcman Servs. Corp. v. Bullock*, 925 F. Supp. 252, 258 (D.N.J. 1996) (quoting *Chaffee v. Smith*, 645 P.2d 966, 966 (Nev. 1982) (per curiam)). "[T]he client, as the personal beneficiary of the duty owed by the attorney, should not be involuntarily divested of the decision as to whether to sue for a breach thereof, since such a rule would permit malpractice lawsuits without regard to (or even contrary to) the client's wishes." *Kracht v. Perrin, Gartland & Doyle*, 268 Cal. Rptr. 637, 640 n.5 (Ct. App. 1990). This is no trivial matter for it infringes the rights and autonomy of the client. Even where malpractice has occurred, there may be reasons why the client would like to forego a claim for legal malpractice and preserve the attorney–client relationship.

The facts and circumstances of this case illustrate the problem. Here, the Grays directed the sheriff to levy on Hohenshell's chose in action for any legal malpractice claim he had against Oliver shortly after the rendition of the $127 million judgment. At the time the sheriff levied and sold the chose in action, Hohenshell had not asserted or filed a claim for legal malpractice against Oliver. In November of 2017, the Grays filed this petition as successors in interest to Hohenshell. This all took place before the court of appeals affirmed the $127 million civil judgment. The Grays thus divested Hohenshell of his right to evaluate his claim for legal malpractice based on full information regarding the success or failure of his appeal. Courts have disallowed assignment for this reason. *See, e.g., Chaffee*, 645 P.2d at 966 ("As a matter of public policy, we cannot permit enforcement of a legal malpractice action . . . which was never pursued by the original client."); *Charles v. Tamez*, 878 S.W.2d 201, 207, 208 (Tex. App. 1994) (holding a judgment creditor may not "force a suit for malpractice," because "[the client] alone can determine if he believes that his counsel misrepresented him").

Second, courts uniformly recognize "permitting the assignment of legal malpractice claims between adversaries threatens the integrity of the attorney-client relationship." *Skipper*, 775 S.E.2d at 38. "The relationship between an attorney and a client is a fiduciary one by nature and 'is founded on the trust and confidence reposed by one person in the integrity and fidelity of another.' " *Id.* at 38–39 (quoting *Moore v. Moore*, 599 S.E.2d 467, 472 (S.C. Ct. App. 2004)). Permitting assignment allows the assignee "to drive a wedge between the defense attorney and his client by creating a conflict of interest." *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 317 (Tex. App. 1994). The element of trust between an attorney and client would "be impaired if the attorney perceives a future threat of the client's

assignment to a stranger or adversary of a legal malpractice claim."
*Jackson v. Rogers & Wells*, 258 Cal. Rptr. 454, 461 (Ct. App. 1989).

Third, involuntary assignment of a legal malpractice claim erodes the attorney–client privilege:

> [A] suit brought on a claim acquired by involuntary assignment, and against the client's wishes, places the attorney in an untenable position.  He must preserve the attorney-client privilege (the client having done nothing to waive the privilege) while trying to show that his representation of the client was not negligent.

*Kracht*, 268 Cal. Rptr. at 640–41.  The *Kracht* court further explained,

> In the ordinary malpractice action brought by a client, the client may not sue for breach of the attorney's duties and also simultaneously prevent the attorney from defending himself by invoking the privilege.  The holder of the privilege, the client, implicitly waives the privilege by filing such a suit.  In an involuntary assignment, however, the suit is not filed by the client, and hence he has taken no action upon which to premise an "implied waiver." An involuntary assignment thus unfairly prejudices either the attorney (by precluding any defense based on privileged communications) or the client (by permitting the assignee to waive the privilege without the client's consent).

*Id.* at 641 n.6 (citation omitted).  The Indiana Supreme Court reached a similar conclusion:

> Whenever an attorney is sued by a client, the attorney is permitted to reveal confidential client information reasonably necessary to establish a defense.  So long as the client retains control over the suit, the scope of the disclosure can be limited by the client's power to drop the claim.  Once the client assigns the claim, however, the client's control over the litigation is lost, but the attorney's right to defend himself or herself by revealing client information survives.  The client is relegated to observing from the sidelines as the assignee pursues the attorney.  If the attorney reasonably responds to the assignee's claim by revealing information the client would have preferred [to] remain confidential, the client cannot prevent the attorney's disclosures. Clients who anticipate this possibility will be no better off than those who are blind-sided by it.  Far-sighted clients would be encouraged to withhold damaging information from their attorney in order to preserve

their ability to sell off a malpractice claim without the fear of losing control over that information.

*Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 343 (Ind. 1991) (citation omitted), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178, 183 (Ind. 2007).

Fourth, "[t]he assignment of a legal malpractice claim is perhaps most incompatible with the attorney's duty of loyalty. . . . If an adversary can retaliate by buying up a client's malpractice action, attorneys will begin to rethink the wisdom of zealous advocacy. A legal system that discourages loyalty to the client, disserves that client." *Id.* at 342; *see Jackson,* 258 Cal. Rptr. at 461 ("[C]ounsel might be discouraged from pursuing vigorous advocacy on behalf of his or her client if that advocacy might alienate the adversary, who might someday be motivated to sue the attorney for legal malpractice under an assignment of rights."). While *Picadilly* and *Jackson* involved voluntary assignments of legal malpractice claims, the same rationale applies equally to involuntary assignments. An attorney's loyalty is likely to be weakened by the knowledge that the opposing party may obtain his client's right to sue him for malpractice as a collection device. By allowing such a remedy, the adversary will be able to retaliate against the attorney.

Fifth, the involuntary assignment of a legal malpractice claim to an adversary erodes the public's confidence in the court system by sanctioning an abrupt and shameless shifting of positions. In concluding that "the costs to the legal system of assignment outweigh its benefits," the *Zuniga* court observed,

> In each assigned malpractice case, there would be a demeaning reversal of roles. The two litigants would have to take positions diametrically opposed to their positions during the underlying litigation because the legal malpractice case requires a "suit within a suit." To prove proximate cause, the client must show that his lawsuit or defense would have been

successful "but for" the attorney's negligence. In the malpractice suit, the [plaintiffs] would argue that [the defendant] suffered judgment not on the strength of the [plaintiffs'] claim but because of attorney negligence.

. . . .

For the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for the truth. It is one thing for lawyers in our adversary system to represent clients with whom they personally disagree; it is something quite different for lawyers (and clients) to switch positions concerning the same incident simply because an assignment and the law of proximate cause have given them a financial interest in switching.

878 S.W.2d at 318 (citations omitted); *see also Edens Techs., LLC v. Kile Goekjian Reed & McManus, PLLC,* 675 F. Supp. 2d 75, 80 (D.D.C. 2009); *Kracht,* 268 Cal. Rptr. at 641; *Picadilly,* 582 N.E.2d at 344–45; *Skipper,* 775 S.E.2d at 39.

Consider the facts and circumstances of this case. In the appeal defending the $127 million civil judgment against Hohenshell, the Grays argued Hohenshell's efforts "to minimize the level of the reprehensibility of [Hohenshell]'s conduct, or the severity of the harm occasioned on Appellees, are simply factually, legally and morally wrong." They also argued "[t]he jury award is absolutely commensurate to the acts." At the same time the Grays were defending the factual, legal, and moral basis for the $127 million verdict against Hohenshell on appeal, they were arguing that the same judgment never should have been entered against Hohenshell if his attorney had provided competent legal representation and that Hohenshell was damaged by "the amount the jury award in the lawsuit exceeded the value of such award were counsel to have represented Hohenshell with competence." The Grays' switch of positions is a "public and disreputable role reversal." *Picadilly, Inc.,* 582 N.E.2d at 344.

"Reduced to its essence, [the former adversary's] argument in the malpractice action is, 'To the extent I was not entitled to recover, I am now entitled to recover.'" *Kracht*, 268 Cal. Rptr. at 641. Public policy militates against this sort of gamesmanship.

Sixth, involuntary assignment of legal malpractice claims might restrict the poor and indigent's access to legal services:

> [T]o allow assignments would exact high costs: the plaintiff would be able to drive a wedge between the defense attorney and his client by a creating a conflict of interest; in time, it would become increasingly risky to represent the underinsured, judgment-proof defendant . . . .
>
> . . . .
>
> Ultimately, to allow assignment would make lawyers reluctant—and perhaps unwilling—to represent defendants with inadequate insurance and assets. Such representation, after all, might make the lawyer the most attractive target in the lawsuit. Lawyers would soon realize that representing the low-asset defendant could bring an assigned malpractice suit after the plaintiff and defendant had made their peace. The pressure for assignment would be minimal when the defendant had adequate insurance or assets. But the underinsured, undercapitalized clients might discover that lawyers are less willing to represent them. By agreeing to represent an insolvent defendant, a lawyer could be putting his own assets and insurance within reach of a plaintiff who otherwise would have an uncollectable judgment.

*Zuniga*, 878 S.W.2d at 317–18. Allowing the involuntary assignment of a legal malpractice claim to a former litigation adversary would discourage law firms and lawyers from representing indigent clients because the lawyers, law firms, and their insurance carriers would become de facto insurance carriers for the underlying tort. Lawyers are not insurers.

Seventh, allowing involuntary assignments could create a commercial market for legal malpractice claims. The *Goodley* court, in an oft-quoted passage, stated,

> The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a

> commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandising such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

133 Cal. Rptr. at 87; *see also Jackson*, 258 Cal. Rptr. at 458; *Picadilly*, 582 N.E.2d at 342; *Wagener v. McDonald*, 509 N.W.2d 188, 191 (Minn. Ct. App. 1993). The same public policy concerns inherent in voluntary assignments are present in involuntary assignments.

In response to all of this, the Grays rely on the case of *Red Giant*. They cite *Red Giant* for the general proposition that choses in action are assignable. *Red Giant* is not relevant to the facts and circumstances of this case. *Red Giant* involved the assignment of a claim of bad faith against an insurance carrier and not a legal malpractice claim. *See Red Giant*, 528 N.W.2d at 527. Lawyers are not insurers. *Red Giant* also involved the voluntary assignment of the chose in action and not an involuntary assignment of a chose in action, which is at issue here.

The Grays also rely on several cases in courts that have allowed the assignment of claims for legal malpractice. *See, e.g., Richter v. Analex Corp.*, 940 F. Supp. 353, 358 (D.D.C. 1996); *White Mountains Reins. Co. of Am. v. Borton Petrini, LLP*, 164 Cal. Rptr. 3d 912, 924 (Ct. App. 2013); *St. Luke's Magic Valley Reg'l Med. Ctr. v. Luciani*, 293 P.3d 661, 667 (Idaho

2013); *Learning Curve Int'l, Inc. v. Seyfarth Shaw, LLP*, 911 N.E.2d 1073, 1081 (Ill. App. Ct. 2009); *Thurston v. Cont'l Cas. Co.*, 567 A.2d 922, 923 (Me. 1989); *Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*, 539 A.2d 357, 359 (Pa. 1988). We conclude the cases are distinguishable and do not address the narrow question presented here.

First, the cited cases each involve a voluntary assignment of a claim for legal malpractice. This case involves the involuntary assignment of a claim for legal malpractice. Second, the cited cases each involve a transfer in which the assignor and assignee had closely aligned interests in the suit or legal transaction at issue, for instance, a successor corporation following the sale of corporate assets, *see St. Luke's Magic Valley Reg'l Med. Ctr.*, 293 P.3d at 667, or the shareholders of a corporation asserting rights of the corporation, *see Learning Curve Int'l, Inc.*, 911 N.E.2d at 1075, 1081. In none of the cited cases were the assignor and assignee litigation adversaries in the suit giving rise to the claim of legal malpractice.

In surveying the relevant caselaw, it appears almost all other jurisdictions considering the narrow issues presented here prohibit the involuntary assignment of a claim for legal malpractice and prohibit the assignment of a claim for legal malpractice to the adverse party in the underlying litigation. *See, e.g.*, *Edens Techs., LLC*, 675 F. Supp. 2d at 79 & n.5 (stating "the majority of courts have found that the costs to society outweigh the benefits and that overriding public policy concerns render . . . assignments [to former adversaries] invalid"); *Kracht*, 268 Cal. Rptr. at 641; *Gurski v. Rosenblum & Filan, LLC*, 885 A.2d 163, 164 (Conn. 2005) ("An assignment of a legal malpractice claim or the proceeds from such a claim to an adversary in the same litigation that gave rise to the alleged malpractice is against public policy and thereby unenforceable."); *Picadilly*, 582 N.E.2d at 338–39 ("[M]ay a party assign a legal malpractice

claim to someone who was his adversary in the underlying litigation? We hold that such assignments are invalid."); *Wagener*, 509 N.W.2d at 191; *Zuniga*, 878 S.W.2d at 318; *Kommavongsa v. Haskell*, 67 P.3d 1068, 1072 (Wash. 2003) (en banc) ("In sum, we can see no advantage flowing to the legal system or the public that it serves from permitting assignments of malpractice claims to adversaries in the same litigation that gave rise to the alleged malpractice.").

The Grays can point to little good contrary authority allowing the involuntary assignment and prosecution of a legal malpractice claim originally held by an adversarial party. For example, the Grays contend New York allows for the free assignment and prosecution of legal malpractice claims, but closer analysis shows this is not exactly true. New York allows for the free assignment of all choses in action, including claims for legal malpractice. *See* N.Y. Gen. Oblig. Law § 13-101 (McKinney, Westlaw current through L.2019, ch. 758 & L.2020 chs. 1–56, 58–88) (allowing assignment with few exceptions). However, New York generally disallows the prosecution of a legal malpractice claim by a former litigation adversary on the grounds of judicial estoppel. *See Molina v. Faust Goetz Schenker & Blee, LLP*, 230 F. Supp. 3d. 279, 287–89 (S.D.N.Y. 2017) (stating there is a "recurring problem in cases where legal malpractice claims are assigned to former litigation adversaries . . . that often leads to the application of judicial estoppel," and holding the plaintiff could not assume the role of successor-in-interest where he was in the "untenable position of arguing [his former adversary] never should have obtained any judgment against [him]"); *Borges v. Placeres*, 105 N.Y.S.3d, 782, 785 (App. Div. 2019) ("The doctrine of judicial estoppel 'prevents a party who assumed a certain position in a prior proceeding and secured a ruling in his or her favor from advancing a contrary position in another action,

simply because his or her interests have changed.' " (quoting *Becerril v. City of N.Y. Dep't of Health & Mental Hygiene*, 973 N.Y.S.2d 586, 588 (App. Div. 2013))). This is the same consideration—although packaged differently—as those courts that disallow the assignment of a legal malpractice claim to a litigation adversary on the grounds that such an assignment constitutes an impermissible shift in positions in violation of public policy. *See Zuniga*, 878 S.W.2d at 318; *see also Edens Techs., LLC*, 675 F. Supp. 2d at 80; *Kracht*, 268 Cal. Rptr. at 641; *Picadilly*, 582 N.E.2d at 344–45; *Skipper*, 775 S.E.2d at 39.

The Grays also rely on the Utah case of *Snow, Nuffer, Engstrom & Drake v. Tanasse*, 980 P.2d 208 (Utah 1999). In *Snow*, the court stated "a legal malpractice claim, like any other chose in action, may ordinarily be acquired by a creditor through attachment and execution." *Id.* at 210. However, the court disallowed the purchase in that case. *See id.* at 212. Subsequently, in *Eagle Mountain City v. Parsons Kinghorn & Harris, P.C.*, the Utah Supreme Court indicated the assignment of a legal malpractice claim would not be allowed where the assignee shifted positions to prosecute the claim as is the case here. *See* 408 P.3d 322, 323, 334 (Utah 2017) (holding "there is a strong presumption that legal malpractice claims are voluntarily assignable," but stating the case at bar did not "feature a shameless shift of positions" that required attorneys to "take a position directly contrary to the one argued earlier").

After reviewing the relevant authorities, we are persuaded by the rationale of those jurisdictions that prohibit the involuntary assignment of a claim for legal malpractice and those that prohibit the assignment of a claim for legal malpractice to a former litigation adversary. We thus hold the judgment creditors cannot prosecute a claim for legal malpractice as successors in interest to their former litigation adversary where the claim

for legal malpractice arose out of the suit in which the parties were adverse. The district court reached the same conclusion and thus did not err in granting Oliver's motion for summary judgment.

## C.

The Grays contend the district court's grant of summary judgment interferes with their constitutional right to acquire, possess, and use their property. For the reasons expressed below, we disagree.

The federal and state constitutions protect property rights. The Fourteenth Amendment to the Federal Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. XIV, §1. The Iowa Constitution provides, "All men and women . . . have certain inalienable rights—among which are those of . . . acquiring, possessing and protecting property." Iowa Const. art. I, § 1. The Iowa Constitution also provides, "[N]o person shall be deprived of life, liberty, or property, without due process of law." *Id.* art. I, § 9; *see Gulf, Colo. & Santa Fe Ry. v. Cities Serv. Co.*, 273 F. 946, 949 (D. Del. 1921) (finding the term "property" includes choses in action).

As a general rule, a chose in action is a species of property protected by both the federal and state constitutions. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S. Ct. 1148, 1154 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause."); *Shearer v. Perry Cmty. Sch. Dist.*, 236 N.W.2d 688, 696 (Iowa 1975) (Reynoldson, J., dissenting), *overruled on other grounds by Miller v. Boone Cty. Hosp.*, 394 N.W.2d 776, 781 (Iowa 1986) (en banc).

Merely recognizing the federal and state constitutions protect the right to property, including choses in action, generally, does not resolve the question of whether the Grays have a constitutional right to assert Hohenshell's claim of legal malpractice. Instead, there is a threshold

question that must be asked: what property did the Grays acquire when they purchased Hohenshell's chose in action for legal malpractice. This is a question of state substantive law regarding property and not federal or state constitutional law. *See Logan*, 455 U.S. at 433, 102 S. Ct. at 1156 (explaining that defenses to tort actions may constitute "one aspect of the State's definition of that property interest" (quoting *Martinez v. California*, 444 U.S. 277, 282 n.5, 100 S. Ct. 553, 557 n.5 (1980))); *Martinez*, 444 U.S. at 282, 100 S. Ct. at 557 ("But even if one characterizes the immunity defense as a statutory deprivation, it would remain true that the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest . . . ."); *Simonson v. Iowa State Univ.*, 603 N.W.2d 557, 562 (Iowa 1999) ("Property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" (quoting *Bennett v. City of Redfield*, 446 N.W.2d 467, 472 (Iowa 1989))).

A chose in action for legal malpractice is an interesting species of property. "[L]egal malpractice actions sound in tort, yet owe their existence in part to contract law." *Miranda v. Said*, 836 N.W.2d 8, 23 (Iowa 2013). More than anything, the malpractice action arises out of the breach of trust and confidence between a lawyer and a client that causes harm to the client, including, in some instances, emotional harm. *See id.* at 33. Because of the personal nature of the claim, the decision on whether to prosecute a claim or forego a claim is vested solely in the hands of the client. *See Alcman Servs. Corp.*, 925 F. Supp. at 258; *Kracht*, 268 Cal. Rptr. at 640 n.5. It is a right of action that is wholly personal to the client. *See Goodley*, 133 Cal. Rptr. at 86 ("Our view that a chose in action for legal malpractice is not assignable is predicated on the uniquely personal nature of legal services and the contract out of which a highly personal

and confidential attorney-client relationship arises, and public policy considerations based thereon."); *Ruden v. Jenk*, 543 N.W.2d 605, 610 (Iowa 1996) ("An attorney is generally liable for malpractice only to a client.").

Given the uniquely personal nature of the claim, we conclude a chose in action for legal malpractice does not encompass the right for another to prosecute the claim as a successor in interest to the holder of the right where the successor obtained the chose in action through involuntary assignment. To conclude otherwise would allow the assignee to destroy the essential element of this peculiar species of property—the client's right to prosecute or forego a claim of legal malpractice. *See Kracht*, 268 Cal. Rptr. at 640 n.5 ("[T]he client, as the personal beneficiary of the duty owed by the attorney, should not be involuntarily divested of the decision as to whether to sue for a breach thereof, since such a rule would permit malpractice lawsuits without regard to (or even contrary to) the client's wishes."). A court should not allow "a creditor essentially to 'force' litigation of a debtor's claim against his will, particularly one arising out of a relationship as personal as that of attorney or insurer and client." *Charles*, 878 S.W.2d at 206. And we decline to do so here.

In sum, the property right in question—a chose in action—comes with legal limitations. One of those legal limitations is that it cannot be the subject of an involuntary assignment to a litigation adversary. By spelling out that legal limitation, which finds support in the common law throughout the United States, we are not depriving the Grays of property. We are delineating the extent of the property right. Because a chose in action for legal malpractice is not subject to involuntary assignment to a litigation adversary, we conclude disallowance of the Grays' claims, as

successors in interest to Hohenshell, works no deprivation of a protected property interest.

In the alternative, even assuming the chose in action encompassed a right of involuntary acquisition, we would still conclude disallowance of the claim does not work a violation of the Grays' constitutional rights. The constitutional right to property "protects 'pre-existing common law' property rights from 'arbitrary restrictions.' " *Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 235 (Iowa 2018) (quoting *May's Drug Stores v. State Tax Comm'n*, 242 Iowa 319, 329, 45 N.W.2d 245, 250 (1950)). Yet, the constitutional right to acquire and use property is not absolute. *See id.* Limitations on the right to acquire and use property may be imposed so long as the limitations are rational. *See Martinez*, 444 U.S. at 282, 100 S. Ct. at 557; *Honomichl*, 914 N.W.2d at 235 (setting forth test in greater detail).

Disallowing the Grays' prosecution of their involuntarily obtained cause of action is rational. It is rational to disallow the acquisition and prosecution of tort claims in contravention of public policy:

> The contention is that, since the state had made causes of action in tort as well as in contract assignable, they had become an article of commerce; that the business of obtaining adjustment of claims is not inherently evil; and that therefore, while regulation was permissible, prohibition of the business violates rights of liberty and property and denies equal protection of the laws. The contention may be answered briefly. To prohibit solicitation is to regulate the business, not to prohibit it. The evil against which the regulation is directed is one from which the English law has long sought to protect the community through proceedings for barratry and champerty. Regulation which aims to bring the conduct of the business into harmony with ethical practice of the legal profession, to which it is necessarily related is obviously reasonable. The statute is not open to the objections urged against it.

*McCloskey v. Tobin*, 252 U.S. 107, 108, 40 S. Ct. 306, 306 (1920) (citations omitted). Further, a property holder has no right to acquire, possess, and use property in contravention of public policy. *See Snyder v. Bernstein Bros.*, 201 Iowa 931, 932, 208 N.W. 503, 504 (1926) (stating a claim to property will be enforced and protected "unless some positive law is violated or public policy is contravened").

As noted above, the majority of jurisdictions have reached the same conclusion and disallowed an involuntary assignee from prosecuting a claim for legal malpractice. In addition, several jurisdictions have specifically concluded there is no right to prosecute a chose in action for legal malpractice by a former adversary where the right was obtained by execution. *See Kracht*, 268 Cal. Rptr. at 639–40; *Mickler v. Aaron*, 490 So. 2d 1343, 1344 (Fla. Dist. Ct. App. 1986) (per curiam); *Chaffee*, 645 P.2d at 966; *Charles*, 878 S.W.2d at 205–06; *Snow, Nuffer, Engstrom & Drake*, 980 P.2d at 211.

For these reasons, we conclude disallowance of the Grays' claim for legal malpractice, as successors in interest to Hohenshell, does not violate the Grays' constitutional right to acquire and possess property.

D.

The Grays argue the district court's decision violated the Iowa Constitution's equal protection clause because it created special malpractice protection for attorneys. The district court concluded the argument is without merit, and we agree.

The Iowa Constitution provides, "All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. "[W]hen conducting an equal protection analysis under the Iowa

Constitution, the first step is to determine if the 'laws treat all those who are similarly situated with respect to the purposes of the law alike.' " *Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 351 (Iowa 2013) (emphasis omitted) (quoting *Varnum v. Brien*, 763 N.W.2d 862, 883 (Iowa 2009)).

Here, the Grays have failed to establish dissimilar treatment. They exercised their right to levy on Hohenshell's claim for legal malpractice and then purchased the same at the sheriff's sale. As discussed above, the chose in action for legal malpractice does not allow for the claim to be prosecuted by an involuntary assignee of the claim. The prohibition is inherent in the cause of action. The Grays' right to levy on and purchase a cause of action has not been infringed. They simply levied on and purchased a property that has no economic value to them. This would be no different than any other judgment creditor causing the sheriff to levy on an asset that is of minimal or no value.

The Grays contend they have been treated differently than other holders of choses in action because disallowing their claim provides special protections for attorneys. We disagree. Disallowing the Grays' claim does not provide special protections to attorneys. "Refusing to allow assignment of legal malpractice claims would not shield an attorney from the consequences of legal malpractice. The *client* would still be able to bring any and all legal malpractice claims against his or her attorney." *Wagener*, 509 N.W.2d at 192 (emphasis added); *see Kommavongsa*, 67 P.3d at 1080 ("[P]rohibiting such assignments will not protect lawyers from the consequences of their own legal malpractice.").

Even if we assume the Grays have shown dissimilar treatment, they still have not established a constitutional entitlement to assert Hohenshell's claim for legal malpractice. The right to levy on and purchase

a chose in action is a statutory right of a nonfundamental nature. Disallowing the involuntary assignment and prosecution of a claim of legal malpractice has a rational basis. *See Master Builders of Iowa, Inc. v. Polk County*, 653 N.W.2d 382, 398 (Iowa 2002) (" 'Unless a suspect class or a fundamental right is involved,' a classification made by a state actor 'need only have a rational basis.' " (quoting *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 689 (Iowa 2002))). As discussed above, there are surfeit of policy considerations that militate against allowing an involuntary assignee of a legal malpractice claim to pursue the action. The vast majority of jurisdictions that have considered the issue have come to the same conclusion, and we need not dwell on the issue any further.

Thus, under the deferential standard applicable here, the Grays have not established a constitutional violation. *See King v. State*, 818 N.W.2d 1, 27–28 (Iowa 2012) ("The rational basis test is a 'deferential standard.' Under this test, we must determine whether the classification 'is rationally related to a legitimate governmental interest.' The classification is valid 'unless the relationship between the classification and the purpose behind it is so weak the classification must be viewed as arbitrary or capricious.' " (quoting *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007))).

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Appel, J., and Christensen, C.J., who concur specially.

**APPEL, Justice (concurring specially).**

I concur in the result in this case. I also cannot join parts of the majority opinion. Although the opinion rightly begins by stating that the question presented is "narrow," the discussion unnecessary sprawls well beyond the specific issue presented in this case.

I agree with the majority on the first major point of discussion. The defendant in this case asks us to fashion a public-policy exception to the ordinary rules of contract and property law. As the majority correctly states, we do indeed have the authority to fashion such public-policy exceptions to the common law.

I do not completely agree with the majority's analysis of the main issue in the case. For the second (integrity of the legal process), fourth (duty of loyalty), fifth (public confidence), and sixth (access to legal services) reasons listed in the majority opinion, I have reluctantly but firmly come to the conclusion that the transfer of a cause of action to a litigation adversary should not be permitted. I agree with the majority's discussion of these specific points.

The majority opinion, however, offers not only the compelling rationale against the transfer of legal malpractice claims, which in my view pose unique problems, but piles on with further rationales that are not moored to the specific issue. It utilizes spill-over rationales—reasons one (only client determines malpractice), three (attorney–client privilege), and seven (commercial market)—that extend well beyond the specific context presented in this case and flood the legal plain off in the horizon. I view the second, fourth, fifth, and sixth reasons presented by the majority as wholly adequate to decide the issue before us.

Perhaps, in an appropriate case, I might be persuaded to expand on the public-policy exception embraced in today's case. But, the argument for expanding the exception outside the moorings established today may well be weaker than the narrow public-policy exception we announce today. It is certainly different. I would not lay the foundation for expansion of our holding with the unnecessary surplus reasoning contained in the majority opinion.

I also regard the "in the alternative" language relating to article I, section 1 of the Iowa Constitution as an entirely unnecessary appendix. There is quite literally no point on a further canvass of a constitutional issue once the case has been decided. Because the article I, section 1 question in this case is completely resolved by the majority's determination that Gray has no property interest, the constitutional discussion should come to an end.

Christensen, C.J., joins this special concurrence.